May it please the Court, my name is Carlos Cruz and I represent the petitioners. I reserve two minutes for rebuttal. Your Honors, the BIA's decision that the petitioners provided false testimony for the purpose of obtaining an immigration benefit is not supported by substantial evidence in the record based on the following three reasons. First, the male petitioner did not testify at his hearing on January 4, 2007. Second, the false information provided by the petitioners at their NACAR interview was motivated by fear and intimidation. And lastly, the false information provided in their applications for employment authorization and the subsequent NACAR application do not constitute testimony as they were not statements made under oath. Your Honor, first, the BIA's decision provides that the petitioners testified, that the male petitioner testified under oath at that hearing. That is belied by the record. The record provides that the immigration judge never placed the petitioner under oath. Instead, it was petitioner's counsel who pled to the allegations in the notice to appear. The petitioner was asked his name, his address, and whether or not he wanted counsel to represent him, but nothing else. And so therefore, this point is clearly an error on the part of the Board in that decision. I want to make sure I understand your argument there because I know you're arguing that he didn't, is it he that didn't give false testimony? Both petitioners are accused of giving false testimony. Right, but you're saying he didn't testify. At that first hearing, yes, Your Honor. Oh, he didn't testify at the first hearing. I guess my question is, but they signed their oaths, didn't they? Yes, they did. And doesn't that create a problem? I mean, it looks like at AR-198 and 209 you can see the signed oaths. So do you dispute the validity of the signed oaths in the record? Not at all, Your Honor. Okay. So was this issue raised below? Where does it indicate? Are you challenging the validity? You're not challenging the validity. Your Honor, we are not challenging the facts in the record with regards to the petitioners being placed under oath by an immigration officer out there in a car interview. That took place. They signed the oath form. The issue, though, Your Honor, is not whether there was false information provided at that interview. The issue becomes what reason the petitioners had in providing that false testimony and whether or not that false information should amount to testimony under Section 101F6 in light of the circumstances presented by this case. The facts of this case go far beyond the scope of those facts contemplated by this Court in both the Vernal v. INS case and the Roman v. INS case. In those cases, there was a simple oath taken by the officer in one case at the naturalization interview and the other at the asylum interview where there was a question-and-answer format where the officer had been trained. It's a simple matter, and the Court found simply that that information amounted to testimony under Section 101F6. But here the facts are vastly different. You have a case where the notary public who perpetuated fraud on these immigrant individuals took the petitioners to the interview himself, who the individual who prepared the applications for employment authorization with false information, who threatened them that they would be detained on the spot and deported if they told immigration about their true nationality, who completed them the car application, who provided them with false birth certificates, is the individual who not only drove them to the interview but also served as the interpreter. He was present at that interview when the oath was taken, and he was the individual interpreting for these petitioners. The integrity – yes, Your Honor? Your clients, though, I think, don't they admit that they gave false testimony during their immigration interviews? They admit that they gave false information, Your Honor. Yes. Okay. So how – what are we supposed to do with that? It seems like those interviews were – their responses were done to advance and get an immigration benefit. Was it not? We submit that it was not done for that purpose, Your Honor. Ultimately, weren't they seeking relief in Nicara specifically at one point? Yes, Your Honor. Initially they were seeking employment authorization. And when they sought that employment authorization, the record is clear. They did it to work legally and to obtain that benefit. Now, the information provided in that application has nothing to do with whether or not they provided false testimony at the hearing. And I understand – and I don't mean to split hairs, Your Honor, because the record is clear. Judge Scalia, in the Kunji's decision, found very clearly that 101F6 does not include statements not made under oath. It does not involve fabrication of documents. It does not involve other misrepresentations. The only time that these petitioners were placed under oath was at that interview. And we would submit to you that the circumstances surrounding the oath would preclude a finding, that this would constitute false testimony under Section 101F6. In addition, they were acting in a way that clearly represents their fear of being detained on the spot. But more than anything, they were clearly influenced by the presence of the notary public who was present at that interview. This Court should not rely in Ramos v. INS and Vernal v. INS in deciding this case because the facts here are clearly different. The issue for the Court is whether this is the type of false information that would constitute testimony for purposes of Section 101F6 when we don't have any of the safeguards that are provided to individuals when the oath is taken. There is no record of the proceeding. There is no video or audio video of what took place at that interview. The Court simply doesn't know to what extent this notary public infiltrated the process. The integrity of the entire oath has been severely compromised by this individual. Well, I thought Cungas, the materiality aspect was what the focus was of the Supreme Court. I mean, they held that the false statements did not need to be material to disqualify Cungas from having the requisite good moral character. Here, and they really sort of crystallized that what mattered is whether the false statements were given with the subjective intent of obtaining immigration and naturalization benefits. And you're saying that we shouldn't focus on anything else other than what they told the asylum officer. But even if we just do that, didn't what they tell the asylum officer support that they were trying to obtain immigration benefits, their intent? That is, Your Honor, certainly what the BIA concluded, but what I'm asking the Court to do, which the Board didn't do, is to consider the impact that the notary public had on these individuals at the interview when that information was provided, to simply ignore the significant influence that this person. But they acknowledged, and you're saying we shouldn't, we are not to look at the subsequent statements that they made, where they acknowledged that they knew, they knew that the notario was telling them what wasn't correct. I mean, they're the ones who brought it to the attention of the notario that they're not really from El Salvador, that they're from Mexico. But then they continued to tell the people at the INS that they were from El Salvador, and specifically at one point to get NACARA relief, which is unique relief granted to aliens. And so I'm just trying to understand your argument in light of what the facts are here. Your Honor, the argument is simple, that there was that if the Court allows that false information at the interview, that that in essence would amount to a due process violation because of the manner in which the interview was conducted. You have an individual notary public who's defrauded these petitioners for years, who's provided false documents, and I understand the Court's concern about the false information that was provided by the petitioners during their preliminary process for work permits and for NACARA benefits. But the issue is not that false information, Your Honor. The issue is whether or not the testimony provided at the interview itself amounts to testimony which would preclude a finding of good moral character. And although we cannot disregard the information that was provided previously, and although it is relevant to the issue of why they lied at that particular interview, the circumstances surrounding this case are vastly different from the leading cases involving when false information at that type of interview constitutes false testimony for the purpose of obtaining an immigration benefit. And for those reasons, Your Honor, I would ask this Court to reverse the Board's decision. Thank you. Thank you. May it please the Court. Good morning, Your Honors. My name is Matthew Connolly, and I'm here today to represent the Respondent to the Attorney General of the United States, Loretta E. Lynch. Your Honors. Mr. Connolly, I just want to start off. Just trying to figure out, even if it's just for curiosity's sake, why the government has declined to exercise prosecutorial discretion in this case. On the specific question of prosecutorial discretion, with regard to the Johnson memos of November 2014, Your Honor, providing false testimony under oath to an asylum officer for the purpose of gaining immigration benefits, specifically notario. Do you dispute that the notario here was dishonest? No, Your Honor, there's no dispute. You acknowledge that the notario was dishonest. He took these folks' money, told them what to say, and that he was going to get them relief, and then proceeded to have them give this information. Is there any other disqualifying information that these folks have, other than this one incident, in which they relied on the notario? Since the hearing process did not get beyond the question of good moral character, Your Honor, the answer to that is no, but it's also unknown. As to whether or not they could have met the other requirements for cancellation of relief. But do you have any idea, or do you suspect that there is something else that would be disqualifying for them? No indication in the record as it stands. Do you have the discretion not to go forward with this case? Not you personally. I mean, does the Attorney General or whoever it is these days have discretion not to pursue this case? In not to pursue or to grant relief, Your Honor? Whichever one would help. Well, Your Honor, in general, I believe that on a case-by-case basis, the government has the discretion to pursue prosecution or not. Okay. Well, that sort of puts, I think, Judge McGee's question in perspective, which is this, I think you can understand, a fairly sympathetic case. People who have been here 23 years, as far as we know, have a good record and have fell into the hands of a notario, and that's not unusual. And you've got lots of people you could pursue. There are plenty of people who deserve to be thrown out of the country. I think Judge McGee's question is, why are you bothering with this case? Okay. First, Your Honor, I must confess, I have a brand new set of hearing aids and I'm still trying to get used to them, but if I understand your question, why are we bothering to pursue this case given other cases, the answer is that, from a technical reason, the decision was correct and that one of the priorities under the Johnson memo is that abuse of the visa process, which would include attempting to get relief, immigration benefits, is something that is meant to be pursued in relation to other cases. The act of the two petitioners going to that NACARA interview, and I believe they actually went to separate interviews, but going and then being told that they needed to tell the truth and then promising to tell the truth and then flatly lying is a substantial offense. And that is that. However, that's the basic question in this case. Would you be able to go back after, without regard to whether you win or lose, well, let's assume you won. Would you be able to go back to Washington and say to them, you know, I think we've got better things to do and maybe now that we've secured our victory we can retire with honor? Well, as an attorney for the United States, I'm always able to go back and give my client advice that I consider to be good common sense. Okay. Well, let's hope. And let's hope you're very persuasive. Let me ask you, with respect to the merits here, where does the record establish that Mr. Herrera actually gave false testimony to the asylum officer? Because it's not entirely clear to me. There are admissions, certainly, that were included on the appeal before the board indicating that the two applicants testified falsely. They went in for the purpose of going to Nicara. But is there any place where Mr. Herrera, under oath, admitted it in front of the immigration judge? Your Honor, I can't point to that in the record. And doesn't that affect your position here today? The problem is, Your Honor, is that the board was presented with a stipulation by the petitioners that the facts, with the exception of the motivation, as stated in the immigration judge made findings. The petitioners stipulated to those findings, including that both petitioners had given false testimony. The only thing that contested was the motivation for that testimony. So the board hasn't reached that question. It was not presented, so it hasn't been exhausted. The other issue for me was figuring out if the board was correct that Mr. Herrera admitted to perjuring himself in front of the immigration judge, I think, in 2007. Because I don't think he actually did that. I think that the best that you can find here in the record is that his the charge of him being from El Salvador, that it was his counsel and not Mr. Herrera. And so, am I missing something? Can you point to somewhere in the record where the board was correct when it said that he perjured himself? Because that's a difference. That is a substantial charge, and I don't think the board was correct in that regard. I believe Mr. Herrera sat silently while his counsel made an inaccurate statement. I'm assuming, I have no idea what his counsel knew, but I'm assuming the counsel didn't make that statement on purpose. So if the board was incorrect on that, what effect does that have on your position? That is not the statement. That is the genesis of the charge that creates the lack of good moral character. Because that was a statement by the counsel, not by Mr. Herrera. But does it not matter, it says that the board was incorrect? No, I think that that error was harmless, Your Honor. Let me ask you one further question about discretion. We do from time to time, not infrequently, send some of the cases to our court's mediation service. I don't know whether you're familiar with that, but we do, and sometimes it's successful and sometimes it isn't. Do you think that you are prohibited by any policy rules from going to mediation and considering whether prosecutorial discretion should be exercised? There are, in any case, dozens of reasons to go to mediation, and the United States is always willing to talk, Your Honor. Thank you. As I said before, I believe the record stands that there is substantial evidence to support the board's conclusion that the petitioners made false statements under oath for the purpose of obtaining immigration benefits. Consequently, the petitioners have failed to demonstrate good moral character, and the agency appropriately denied their applications for cancellation of removal. If there are no further questions, thank you, Your Honors. Thank you, counsel. Thank you. Your Honors, there is no other disqualified information in this case. Absent the finding of the board and the immigration judge, there is no criminal record in this case. There is evidence in the record that the petitioners are homeowners that have been here for 22 years, and we will certainly welcome the opportunity to seek discretion before the service. In addition, there was only one interview in this case where there was possibly false testimony provided by the petitioners, and Your Honor is absolutely correct when you say that there is absolutely nothing in the record with regards to the male petitioner being asked about why they provided false information at that interview. The record is completely silent on that, and with regards to the female petitioner, she was only asked twice about why they provided false information. The first by counsel, and she replies, because we were afraid of being deported. And the second by the immigration judge, where they simply, again, stated that the man was threatening them. Those are the only two questions in the entire record with regards to why in this case these petitioners provided false information to the officer at that interview. The record is inconclusive. I have to say it's not really a very good reason to say we lied because we didn't want to be deported. Absolutely not, Your Honor. Okay. And the case goes far beyond that, Your Honor, and I hope that our papers have shown that and that the argument today is helpful. Again, we would ask the Court to remand this case back to the BIA. Thank you, Your Honors. Thank you. Thank you. And I want to thank you. I want to congratulate you both on really excellent arguments and to thank the government counsel for his frankness and integrity in presenting the argument. It's not always our experience that I hesitate to say government lawyers. I was only one for 12 years. That's okay. No big deal. 15. I was only one for 15 years. What I consider a far higher obligation than the obligation of private counsel. And it was really an excellent experience to see you conduct yourself in that manner. Thank you. Thank you, Your Honor. Thank you, Counsel. Thank you. The case just argued is submitted.
judges: Reinhardt, Murguia, Owens